Good morning, ladies and gentlemen. Judge Akuda and I are very pleased to have our friend Judge Don Molloy from the District of Montana joining us today. Don, thank you for taking time out of your busy schedule to help us out. Singh v. Barr submitted on the brief, so we'll proceed with the argument in Gurung v. Barr. And if I've mispronounced the name, you can correct me. Singh v. Barr Good morning, Your Honors. My name is Bhanpreet Singh Gara, spelled as G-A-H-R-A, and I represent the petitioner, Mr. Rambhadu Gurung. Out of my 10 minutes allotted to me, I would like to reserve about three minutes for rebuttal, if that's necessary. Thank you so much, Your Honor. Your Honor, this petition of review has come up before this honorable panel based on denial of my client's claim for asylum withholding or removal by the Board of Immigration Appeals dated February 13, 2015. My client, Mr. Rambhadu Gurung, is a native and citizen of Nepal. After seeking retirement from the Indian Army, he joined the Nepal Congress Democratic Party, and while he was doing his activities with this organization, he was targeted by the Maoists who were very active in Nepal. This is the time frame when the civil war was still going on. At the same time, there were some political changes also coming into place. And basically, Mr. Gurung was approached by the Maoists on two accounts. They wanted A, they wanted him to come forward and help them train their troops because of his military background, and B, also at the same time, they wanted him to leave NCP, provide some support to the organization, and basically join them. So the IJ made his, based his adverse credibility determination, as I understand it, basically on two different inconsistencies. One of them was an inconsistency between his statement that the Maoists took his property and the letter that he introduced into evidencing that YCL took his property. And the second one was that his voluntary return to Nepal undermined his credibility. So can you address why we're compelled to find that the IJ was wrong? Sure. Thank you, Anna. I think that is the basis of this appeal. First of all, Anna, it's very important to understand that YCL, which was the Young Communist League, it came into being sometimes in 2007. You know, you started seeing it doing its activities. It is the youth thing of the Maoist Party. So though it was, it's the YCL, but at the end of the day, it was one big organization. It's just a political party having a youth thing. So that was, that is the status of YCL. Now... So the IJ, or they were questioning in the hearing saying, do you know the YCL? Is it the YCL? He says, absolutely not. No, it's the Maoists. And then he comes up with a explanation saying, well, maybe because my uncle and my property were contiguous, the HRN misunderstood. And so the IJ said, you know, this is just making things up and there's, this inconsistency is unexplained. Why was that wrong? So that was wrong, Anna, for the very simple reason that 2006, when my client's property was confiscated by the Maoists, YCL was not in being. It was the Maoists. According to my client, it was always the Maoists. Now, the record would show that in 2008, his uncle was also attacked and his property was also taken away by the Maoists. And in 2011, that human rights organization, the document from which is in the record, when they went and conducted their survey, they basically, in their letter, they write that the young communists leave and they also talk about the Maoists. And in his testimony before the court, he did, my client did mention that YCL is, they're the young people, they're part of the Maoists, YCL and Maoists is the same. So as far as my client was concerned, in his mind, it was the Maoists who took away the property. Yes, the letter does reflect YCL, but YCL and the Maoists are the same. So even, and that was repeatedly, that was the position of my client during his cross-examination by the immigration judge. So his, in his mind, it was the Maoists who took the property and not the YCL, which is correct in his thinking, because the YCL was not in existence at that time. And as per his own testimony, he came to know about YCL in 2008, after his uncle was attacked. And that kind of also prompted him to seek asylum here in this country. I hope I have addressed your concern. So do you want to address the, the IJ also thought that the voluntary return to Nepal undermined his credibility? Right, Yana. So the IJ did invoke this court's decision in Loho, but Mr. Gurung's case is very distinct from Loho. And the major distinction is that my client, Mr. Gurung, had his first visit on a cruise ship, and then he returns. And after his return, there's an escalation, meaning he gets attacked by the Maoists, he's beaten up. And then there are... And then he stays another few weeks, or a month, he stays in Nepal for another, in Kathmandu, I think it was at the time, for another few months, until he gets another, after he was attacked, he stays in Kathmandu until he gets another contract. And then he leaves. And then the IJ and the BIA said, well, he's leaving when he gets a contract. This isn't, this isn't fear of his life, but just taking advantage of getting a job. True, true. Yes, Yana, because after he was physically attacked, he started looking for avenues to leave the country. And since he had already been on a, on a shipping contract, that was the best option he had. And he was able to secure that. And then he came to Atlanta. So you're saying he wasn't, he didn't fear for his life when he left the first time. So when he was in Australia, when he was in Australia from working for the Norwegian shipping company, you're saying he wasn't in fear of his life? Yana, at that time, before he left for Australia, before he left on that five-month cruise, his job on the cruise ship, he had been only, he had been approached by the Maoists. He had been threatened, yes. So yes, that threat was there. But it had not escalated to a level where he really felt threatened or persecuted of, he had the fear, because after, because he had not been physically attacked by them. It was just a verbal threat. Hey, join us, do this for us, pay us this money. If you don't, then the consequences could be bad. And then he, then he leaves the country, comes back, and he's not met the requirements, the other point is, Yana, as in Loho, the petitioner went back to her home country two times, and that was a voluntary departure. She voluntarily went back and voluntarily was, she was, totally she was able to leave the country. In my client's scenario, Yana, when he was working at the ship, the ship had his passport. And so was he, was the ship keeping him at gunpoint, or was, because it sounded like it was just a job. So how did they, could they have locked him up on the ship? I mean, that was questions that came up during the hearing. Yes, Yana, that question did come up, and you know, and it was not really, the question didn't go at length on this, on this point. Except that my client, so Yana, it's Did the employer have some police power over him? Well, when you're working on the cruise ship, sorry Yana, sorry to interrupt. When the, when you're working on the cruise ship, the cruise, the cruise line takes your passport. They secure your passport, because if somebody was to disembark the ship and basically not come back, if the ship hits a port and they disembark, they don't return, then the ship is fined. It's a heavy fine they have to pay. So he could have left and said, I fear for my life in Australia. And he could have left. He could not have, Yana. And then he would say, but they're holding my passport. And so you're saying he couldn't do that? He could not have done that, Yana. He was working as a security officer. And it's in, his testimony in the record that when the ship ported at Australia, he, and there was another security officer, they were on duty while it was there. So he could not have left the ship. So he was being held at gunpoint, or was he? No, Yana, he was not. It was just his responsibility as an employee. His responsibility as an employee. He was not being held at gunpoint at all. But then when his contract ended, he was escorted to the airport. And then, and then he had... At gunpoint? No, Yana, it's not at gunpoint, but he was escorted by an employee of the shipping line. And he was taken to the airport. And once he had checked in, was his passport handed over to him, and then he returned. So it was not a very voluntarily that, you know, he didn't have the freedom, so to say, not at gunpoint, but he didn't have the freedom to basically walk away because there was a personnel with him to ensure that he leaves the country as per the terms of the contract. So unlike Lohot, it was not a very voluntary return to Nepal. And the other point that is important is, Yana, after he returns to Nepal, he doesn't go back to his village or his hometown of Pokhara. He goes to Kathmandu. And while he's in Kathmandu, and he rents a place in a hotel, stays there, and then he gets attacked. And now is the time when he comes to, he leaves again on a contract which he's able to secure when he comes to Atlanta. Thank you, counsel. Thank you. Good morning, Mr. Chief Judge, and may it please the court, Rodolfo Saenz for the U.S. Attorney General. This case should deny, this court should deny Mr. Groom's petition for review. Substantial evidence supports each of the primary findings the agency made in this case. One, it's denial of asylum based on an untimely application and failure to show changed circumstances. Two, it's denial of statutory withholding of removal based on a finding that Mr. Groom was not credible. And three, it's denial of cat protection based on a failure to show that it was more likely than not that he would be tortured in Nepal or that the Nepalese authorities would acquiesce to that torture. If I may, I'd like to jump right into the adverse credibility finding. The agency, as was mentioned, the agency relied on two grounds, the voluntary return in February 2007 and the inconsistency about who seized the land in late 2006. As to the return, the agency properly determined that the return undermined his credibility. This case is comparable to the Loho case in three key respects. One, there's evidence that he did fear upon leaving Nepal in September 2006. Despite options available to him, he returned in February 2007 and when on the stand in front of the immigration judge, he provided a puzzling explanation for the Contrary to my counsel's assertions earlier, there is evidence in the record that he did in fact have fear when he left in September 2006. Principally in his declaration, this is at AR 699, he's referring to the March 2006 attack. I discussed this matter with my family and friends. They suggested me to leave the place immediately. So I decided to leave my country and go abroad until the situation in Nepal gets back to normal. This is his own assertion that he feared, but there's also circumstantial evidence as well. He testified that he spent four to five months after the March 2006 attack with his brother in Pokhara. Again supporting the contention that he feared leaving, he also testified that he returned to Kathmandu. That actually goes to the fear. He returned, he did not want to go back to his original village because he was in fear that he was going to be attacked by the Maoists again. The explanation that he gave for the return was that his contract had expired. There is insufficient- Can I ask a question? Are you arguing that the IJ determination that he wasn't credible is a viable argument? And the reason I'm asking the question is your 28J seems to me like all the arguments about his credibility you have withdrawn. Am I correct? Incorrect, Your Honor. Not the adverse credibility. We withdrew the alternative finding that was denying statutory withholding of removal based on his failure to show past persecution. The adverse credibility finding, we argue, still stands. The Board, in its decision at AR 69 footnote 1, acknowledges that standing alone each of the bases may not be enough, but together, under the totality of circumstances, they are. But the IJ's determination that he was not physically attacked was incorrect, wasn't it? Correct, Your Honor. So let's assume we have a situation where a person is a little afraid. There are a lot of cumulative events. So he returns from the cruise ship and then he gets beaten up. If we just take that scenario, why isn't that enough to establish past persecution? So you're talking about the harm that he suffered upon his return? Why isn't that enough to- Because I think everybody thinks he was credible on that. I mean, your 28J essentially concedes that. Yes. We concede that the- So forget everything that happened before he returns from the cruise ship. Well, we didn't concede, Your Honor, that he was credible as to what he testified to in that harm. We conceded that the harm didn't rise to the level of persecution was a mistake and we withdraw the argument defending him. I understand that. I'm just saying, but there doesn't seem to be much doubt that he was beaten up. Is there? Well, if we have an adverse credibility determination, then it was for all of his testimony. Correct. The testimony would basically be off the table. Okay. Well, let's assume that just what happened after he left the cruise ship. And hypothetically, let's say that he was beaten up. And according to your narrative, he's always had this fear, but now he comes back and he's beaten up again. Why wasn't that, if standing alone, enough? For persecution? Yes. It may or may not be. I think our position would be we would like the agency to make that determination in the first instance, should it be appropriate. But it may. I mean, there's physical harm here. And when combined with the other instances that he underwent the threats as well, it may very well be. Let's turn to the other basis for the adverse credibility finding. Do you concede or not concede that the Young Communist League is a branch or affiliated with the Maoists? Yes. If we step back and we view that explanation in isolation, it makes sense that the Youth Wing is part of the Maoists. They're the same. But we have to view the entire full picture from beginning to end, which is he first testified that it was only the Maoists and he said he was sure of it. He suggested that they're different groups. But then he provided, at least by my count, eight times he was asked. He gave different explanations throughout those eight confrontations, among which he did testify that the Maoists and the YCL took my property. He also testified that the letter is correct. So he essentially gave all three possibilities to answering the question of who sees your property. Right. But if it's essentially the same group, why does it matter? It matters, Your Honor, because it – Let me put it a different way. There may be some discrepancy, but why is it a material discrepancy if they're all essentially the same group? Well, assuming it's a discrepancy, it's material because it goes to his claim that he suffered harm, persecution in Nepal, and it also goes to his fear of returning for being harmed by the Maoists again. So it goes to his claim. It would be part of his path. I guess I'm probably not asking my question very clearly, but why is it a material to his credibility if it's part of the same group and he's just using the terms interchangeably? I see. Again, I think our position would be that viewing the explanation in isolation, it certainly makes sense. But what we have here is inconsistent explanations as well as inconsistent testimony, which the immigration judge had to view collectively together. And that makes it – I thought he testified that it was not the YCL, and he was sure. He said that. He was asked a couple of times, are you sure it wasn't the YCL? And he said, yes, I'm sure. Correct, Your Honor. That was his initial response. And then in – that was in April 2013. In June 2013, that's when he provided the explanation that they are – that it was – that they didn't exist. And then he also testified the Maoists and the YCL took my property. That's at AR 320. And also that the letter is correct. That's also at AR 320. Essentially, as part of his narrative, he was providing different responses. And that collectively is enough to be substantial evidence. And there's not evidence here to compel acceptance of the explanation. Just because we have a plausible explanation does not mean that the result is compelled otherwise. I'd like to quickly address the Convention Against Torture claim, if I may. The agency relied on two independently dispositive grounds there. One, the likelihood of torture in Nepal, and two, that the Nepalese authorities would acquiesce to that torture. Our position would be that regardless of the past harm misstatement in the board's decision and of whether we have a problem with adverse credibility, the Convention Against Torture finding would stand based on the acquiescence alone. There's no meaningful argument provided in the briefs suggesting any evidence of acquiescence here. General ineffectiveness is insufficient for acquiescence, and Mr. Groom does not point to any evidence of government complicity in private acts. So that would be our position on the Convention Against Torture. And then with changed circumstances, we submitted a 28-J letter referencing the Budiono case. We believe that that is dispositive here. A very similar set of facts with a friend being murdered and not having changed circumstances. I see my time is up. Just to sum up, the reasons discussed today and for those stated in our brief, we believe substantial evidence supports the agency's three findings, and we ask that the court deny Mr. Groom's petition for review. Thank you, counsel. Thank you. We'll give you one minute for rebuttal. You used up your time. Thank you. I'll make it really quick. And I would like to draw the panel's attention to AR 171. This is where the cross-examination of my client is going on, and he gets asked, did the Young Communist League ever grab your property? YCL there knew they haven't come. Maoists did. And then he goes on to say, they are Maoists, new young kids. They get the kids gathered by Maoists. So, again, to my previous argument that, yes, in 2006, YCL wasn't there, but, yes, the letter does mention about the YCL. However, he did acknowledge that, and he did testify that they both are the same organization. They're part of the same organization. Now, for us to kind of divide the two and say, hey, you know what, it was the YCL, not the Maoists, it would not make sense, because at the end of the day, they're all Maoists. Whether, let's say, a YCL came, a young guy from the YCL came, or whether somebody who was actually a Maoist, an adult, came, the bottom line still remains that it was they're the Maoists, and they're the ones who took his property. I see that flashing out. Thank you so much. Thank you, counsel. Thank you both for your arguments today. The case just argued will be submitted for decision.
judges: Thomas, Ikuta, Molloy